Filed 4/20/15  In re M.B. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.B., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>M.B.,<br><br>    Defendant and Appellant. | A140777<br><br>(Contra Costa County<br>Super. Ct. No. J1300295) |

Defendant M.B., a minor, appeals after the juvenile court denied her motion to suppress evidence (Welf. & Inst. Code,[1] § 700.1) and sustained a wardship petition (§ 602, subd. (a)) alleging M.B. committed attempted first degree robbery (Pen. Code, §§ 211, 212.5, 664; count one), first degree residential burglary while a nonparticipant to the offense was present (Pen. Code, §§ 459, 460, subd. (a), 667.5, subd. (c)(21); count two), and infliction of injury on an elder (Pen. Code, § 368, subd. (b)(1); count three).[2] M.B. was 13 years old at the time of the charged offenses.  The court sustained the allegations after a combined hearing on the suppression and jurisdictional issues.  The

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The petition also alleged that, on a different occasion, M.B. resisted an officer in the performance of his or her duties (Pen. Code, § 148, subd. (a)(1); count four).  The court dismissed that count on the prosecution's motion.

1

court declared M.B. a ward, ordered out-of-home placement, and imposed terms and conditions of probation.

On appeal,[3] M.B. contends (1) the court erred by denying her motion to suppress two statements she made to police, (2) the court erred by combining the suppression and jurisdictional hearings, thus depriving M.B. of the opportunity to be considered for deferred entry of judgment (DEJ), (3) there was insufficient evidence to rebut the statutory presumption M.B. was incapable of committing a crime because she was under 14 at the time of the offenses (Pen. Code, § 26), (4) there was insufficient evidence to support the allegations against M.B. as to some of the charged crimes, and (5) the court's placement order violated M.B.'s constitutional rights.

We conclude the juvenile court properly declined to suppress the second of M.B.'s two statements to police. We need not decide whether the court should have suppressed M.B.'s first statement, because admission of that statement, even if erroneous, was not prejudicial. We agree with M.B. that the court, by erroneously combining the suppression and jurisdictional hearings, deprived M.B. of the opportunity to be considered for DEJ. We will vacate the jurisdictional and dispositional orders and remand for the juvenile court to consider whether M.B. is suitable for DEJ.

## I. BACKGROUND

On December 2, 2012, at about 2:00 p.m., Rachel Dias was in her Concord home. Dias was over 80 years old, had diabetes and heart problems, and had suffered a stroke a few years earlier. A "young lady" knocked at Dias's door and asked if a named person lived there. Dias responded that the person did not live there; Dias may also have stated she lived alone.

---

[3] Trial counsel for M.B. filed a premature notice of appeal on January 14, 2014, before the juvenile court entered its January 28, 2014 dispositional order. In February 2014, we entered an order stating we will construe M.B.'s notice of appeal to have been taken from the dispositional order. (See Cal. Rules of Court, rule 8.406(d).) (All rule references are to the California Rules of Court.)

2

After the girl left, Dias was sitting at her kitchen table writing Christmas cards. When her dog growled, Dias noticed a young male standing behind her chair. Dias screamed. The young male told Dias he was not going to hurt her, but wanted her money. Dias stood up and retreated toward her refrigerator. She was hyperventilating and feared she was going to have a heart attack. The young male then left through Dias's back door. Dias called 911.

Police officers arrived, spoke with Dias, and obtained descriptions of the female who had knocked on her front door and the male who had entered her house. Dias told police that the person who entered her house was an African-American male, who was about 16 years old and about five feet, 10 inches tall, thin, and wore a dark, hooded jacket. Dias told police that the person who knocked on her door was a white female, about 14 or 15 years old, who had long, dark hair and was about five feet, seven inches tall. Dias thought the two juveniles might have been working together, and the officers believed this might be the case.

Officer Kristen Thoms drove around the area to look for the perpetrators. At approximately 3:38 p.m. in Cowell Park, which is less than one-half mile from Dias's residence, Officer Thoms saw two people she believed matched the descriptions Dias had provided. Officer Thoms saw a tall, thin, African-American male juvenile wearing a black jacket and black shorts, walking with a white female juvenile with dark hair, who appeared to be about 15 years old. Officer Thoms drove her police car onto the grass in the park, stopped about 15 feet from the two minors, and got out of the car. The girl was M.B.; the boy was H.F.

Officer Thoms asked the minors if she could speak with them. Both of them said yes and walked toward the officer. As Officer Thoms spoke with the minors, they appeared nervous; M.B.'s lips were quivering and her hands were shaking. Officer Melanie Kaiser arrived and noted the minors matched the descriptions Dias had provided to police.

Officer Michael Ito drove Dias to Cowell Park. Seated in the front seat of Officer Ito's police car, Dias stated M.B. was not the person who came to her door, and H.F. was

3

not the young man who was in her house.  Officer Ito told Officer Thoms, and the officers released the minors.

When Officer Ito returned to his car, Dias was having second thoughts about whether H.F. was the person who entered her house.  Dias stated, " 'Well, that kid over there [H.F.] is wearing the same jacket.' "  Dias said H.F. "might have been" the intruder in her house.  Dias reiterated, however, that M.B. was not the girl who had knocked on her door.  Officer Ito went to tell Officer Thoms that Dias was reconsidering her exculpation of H.F.  When Officer Ito returned to his car, Dias was staring intently at H.F. and said, " 'That's him.' "  She clarified she meant H.F. was the young man who was in her house.  Officer Ito told Officers Thoms and Kaiser that Dias had identified H.F. as the intruder.

Officers Thoms and Kaiser began to look for M.B. and H.F., who by this time had walked away through the park.  Officer Thoms drove out of the park, proceeded westbound on Cowell Road, and turned onto Hale Way, where she saw M.B. and H.F. walking together.  The officer stopped her car on the right side of the road; the minors were on the other side, walking toward the officer.  Officer Thoms got out of her car, told the minors that the police "need a little bit more information," and asked if they were willing to be photographed.  Both said yes.

Officer Thoms asked M.B. and H.F. to repeat their contact information to confirm it was consistent with the information they had provided earlier.  Officer Thoms told them someone would arrive to take their photographs, and the minors said that was fine.  The CSI team arrived five to 10 minutes later.  At that point, M.B. and H.F. were standing with different officers.

Officer Kaiser told H.F. that Dias had positively identified him as the intruder and stated the police needed a photo of him.  Officer Kaiser told H.F. the police had found a fingerprint at the scene and wanted to check his fingerprint to see if it matched the one found in Dias's home.  H.F. agreed to submit to a fingerprint check test.  A CSI officer arrived about seven minutes later and took a fingerprint of one of H.F.'s fingers.  "[A]bout a minute later," Officer Kaiser told H.F. his fingerprint matched the one found

4

at Dias's home. H.F. initially denied knowing anything about the events at Dias's house, but he eventually admitted he had been in the house but had left when he saw Dias's medical alert necklace. Officer Thoms then handcuffed H.F. and placed him in her patrol car.

Officer Kaiser walked to where M.B. was standing with another officer. Officer Kaiser told M.B. that H.F. had told officers that M.B. had been at Dias's front door. Officer Kaiser told M.B. it would look bad if she lied. The officer stated there must have been a reason the minors did what they did, and the officer mentioned Christmas was coming up (to suggest the minors might need money). M.B. admitted she knocked on Dias's door as a "distraction." Officer Kaiser handcuffed M.B., escorted her to the officer's police car, and advised M.B. of her *Miranda* rights.[4]

At the police station, Officer Kaiser again advised M.B. of her *Miranda* rights. M.B. then gave a recorded statement. In that interview, M.B. stated she and H.F. planned to try to get money from Dias, but did not want to hurt her. Their plan was that M.B. would knock on Dias's front door to distract her and make sure no one else was in the house, while H.F. would enter the house from the back.

The officers' first contact with M.B. and H.F. began about 3:39 p.m. The second contact began about 3:55 or 4:00 p.m. Officer Kaiser arrested M.B. about 4:30 p.m. Officer Kaiser began her interrogation of M.B. at the police station about 4:50 p.m.

## II. DISCUSSION

### A.  The Motion to Suppress

M.B. contends the juvenile court should have suppressed her statement to police on the street near the park and her later statement at the police station. M.B. argues (1) the statements were the product of an illegal detention, (2) the police obtained the statements in violation of *Miranda*, and (3) the statements were not voluntary.

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

### 1. The Trial Court's Ruling

The juvenile court concluded both contacts by the police with M.B. and H.F. were reasonable. As to the second contact (during which M.B. made her statement), the court found the contact began as a consensual encounter, but became an investigative detention when Officer Kaiser conducted the fingerprinting "ruse" and then questioned M.B. The court concluded the detention was lawful and the officers "did not detain [H.F. and M.B.] any longer than they needed to in terms of the steps that they took in their investigation . . . ." The court also concluded that the encounter was not a custodial interrogation triggering the need for *Miranda* warnings, and that the officers did not employ coercive methods.

### 2. Unlawful Detention

In reviewing a ruling on a motion to suppress, we " 'review[] the evidence in a light favorable to the trial court's ruling. [Citation.] We must uphold those express or implied findings of fact by the trial court which are supported by substantial evidence and independently determine whether the facts support the court's legal conclusions.' " (*In re William V.* (2003) 111 Cal.App.4th 1464, 1468.)

M.B. contends that, when the officers contacted her and H.F. in the park and later on a nearby street, they unlawfully detained her, and both her initial admission to Officer Kaiser on the street and her subsequent confession at the police station must be suppressed as the products of the unlawful detention. We disagree.

The Fourth Amendment permits a police officer to detain a person for purposes of questioning or other limited investigation when the officer has a reasonable suspicion, based on articulable facts, that the person has been, is, or is about to be engaged in criminal activity. (*Terry v. Ohio* (1968) 392 U.S. 1, 21–22; *In re Tony C.* (1978) 21 Cal.3d 888, 893.) To satisfy the requirement of reasonable suspicion, a police officer must point to specific facts that, in light of the totality of the circumstances, provide an objective manifestation that the person to be detained may have been or is involved in criminal activity. (*People v. Souza* (1994) 9 Cal.4th 224, 231.)

Here, assuming the police detained M.B. and H.F.,[5] the officers had reasonable suspicion justifying both contacts with the minors. Dias's descriptions of the perpetrators justified the first contact. As noted, Dias told police the person who entered her house was an African-American male and was about 16 years old, about five feet, 10 inches tall, thin, and wore a dark, hooded jacket. Dias told police the person who knocked on her door was a white female, about 14 or 15 years old, who had long, dark hair and was about five feet, seven inches tall. The officers reasonably believed the two individuals might be working together. Officer Thoms explained that, based on her training and experience, "people often do come to residences and knock on the front door to see if anybody's home prior to burglarizing it."

When Officer Thoms saw two juveniles who generally matched these descriptions (M.B. and H.F.) walking in a park less than one-half mile from Dias's home, she had reasonable suspicion justifying stopping them to determine whether they were the perpetrators. As noted, Officer Thoms saw a tall, thin, African-American male juvenile wearing a black jacket and black shorts, walking with a white female juvenile with dark hair who appeared to be about 15 years old. We reject M.B.'s argument that, because she turned out to be 13 (rather than 14 or 15)[6] and five feet, three inches tall (instead of five feet, seven inches tall), her appearance was not sufficiently similar to the description provided by Dias to justify the stop.

The scope of the first contact was reasonable. The officers released the minors after Dias stated they were not the perpetrators.

After Dias reconsidered her exculpation of H.F. and identified him as the person who was in her house, the officers had reasonable suspicion justifying the second stop. Although Dias reiterated that M.B. was not the person who knocked on her door, police had reasonable suspicion justifying stopping her along with H.F. As noted, police

_____

[5] Because we conclude any detention was lawful, we need not address the Attorney General's argument that the first contact was, and the second contact began as, a consensual encounter rather than a detention.

[6] The trial court later observed M.B. "physically appears older than 13."

reasonably believed the girl who came to Dias's door was working with H.F.; M.B. generally matched Dias's description of the girl at the door (and the officers understood Dias did not think she could identify the girl because she had been looking through a security screen door); and M.B. was walking with H.F., both in the park and later on the street.

The scope of the second contact, during which the officers briefly questioned H.F. and then M.B., was also reasonable. During a valid temporary detention, police may briefly question the detained person. (*People v. Davidson* (2013) 221 Cal.App.4th 966, 971.) The fact Officer Kaiser misled H.F. (by stating his fingerprint matched one found at Dias's house) and then M.B. (by stating H.F. had implicated her) does not establish the questioning was improper and provides no basis for suppressing M.B.'s statements. (See *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 [police may use deception to trick a guilty person into confessing].)

Because any detention of M.B. was lawful, there was no basis for suppressing either of M.B.'s statements as the product of an unlawful detention.

### 3.    *Miranda*

M.B. contends the police had to give her *Miranda* warnings before she made her first admission on the street, and their failure to do so requires suppression of that statement and her subsequent confession at the police station.

*Miranda* warnings are only required when a person is subjected to "custodial interrogation." (*Miranda, supra,* 384 U.S. at p. 444; *People v. Mickey* (1991) 54 Cal.3d 612, 648.) We need not address the parties' arguments as to whether Officer Kaiser's questioning of M.B. on the street was a custodial interrogation triggering the *Miranda* requirements. Even assuming *Miranda* warnings were required and M.B.'s initial admission on the street should have been suppressed, this alleged *Miranda* violation did not require the suppression of M.B.'s subsequent statement at the police station.

As noted, at the police station, Officer Kaiser advised M.B. of her *Miranda* rights before interviewing her. In general, when a suspect makes a voluntary statement in

custody after waiving *Miranda* rights,[7] the statement is not rendered inadmissible merely because the suspect also made an incriminating in-custody statement before the *Miranda* warning.  (*Oregon v. Elstad* (1985) 470 U.S. 298, 309, 318 (*Elstad*).)  An exception to this rule applies when police officers initially interrogate a subject without giving *Miranda* warnings, and then, after obtaining an incriminating statement, advise the suspect of her rights and elicit the same or additional statements, for the purpose of evading *Miranda* protections.  (*Missouri v. Seibert* (2004) 542 U.S. 600, 604–607 (*Seibert*) (plur. opn. of Souter, J.) [officer questioned subject for 30-40 minutes and made a " 'conscious decision' " to withhold *Miranda* warnings, pursuant to interrogation technique he had been taught, i.e., to "question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once' "].)  A deliberate effort to evade *Miranda* by using such a two-step interrogation procedure may render the statements inadmissible.  (*People v. Rios* (2009) 179 Cal.App.4th 491, 505.)[8]

The question, therefore, is whether Officer Kaiser deliberately withheld *Miranda* warnings when she spoke with M.B. on the street, with the intent to elicit information in a manner that would effectively deprive M.B. of her *Miranda* protections.  This is a factual question we review for substantial evidence.  (*People v. Camino, supra,* 188 Cal.App.4th at p. 1372.)

---

[7] We conclude below that M.B. voluntarily and knowingly waived her *Miranda* rights at the outset of the stationhouse interview.

[8] The plurality in *Seibert* stated that the circumstances to be considered in determining the effectiveness of the post-admission *Miranda* warnings include "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."  (*Seibert, supra,* 542 U.S. at p. 615.)  In a concurring opinion, Justice Kennedy narrowed the exception to circumstances where the two-step interrogation technique was used in a calculated way to undermine *Miranda,* in which case the post-*Miranda* statement must be excluded in the absence of curative measures taken before the post-*Miranda* statement was made.  (*Id.* at pp. 620–622 (conc. opn. of Kennedy, J.).)  Because Justice Kennedy's concurrence provided the narrowest rationale for the decision in *Seibert*, it constitutes the holding of the case.  (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370.)

Substantial evidence supports the conclusion Officer Kaiser did not engage in a deliberate two-step interrogation process to evade the protections of *Miranda*. Unlike the interrogation that was calculated to evade *Miranda* protections in *Seibert*, there was no evidence here that the Concord Police Department had a policy of deliberately withholding *Miranda* warnings until after obtaining a suspect's confession, and Officer Kaiser did not state she withheld the warnings to evade *Miranda* protections.

Moreover, one explanation for Officer Kaiser's decision not to give *Miranda* warnings before questioning M.B. on the street is that she did not believe M.B. was in custody. (See *Seibert, supra,* 542 U.S. at p. 620 (conc. opn. of Kennedy, J.) ["officer may not realize that a suspect is in custody and warnings are required"].) A person is in custody for *Miranda* purposes if his or her " 'freedom of action is curtailed to a "degree associated with formal arrest." ' " (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403; *id.* at p. 1404 ["*Miranda* warnings are not required during the course of a brief detention unless the suspect is placed under restraints normally associated with formal arrest"].) Here, although other officers and police cars were present, the questioning occurred in a public place, i.e., on the street near the park. M.B. was not handcuffed, was not seated in a police car, and had not yet been formally arrested. Even if M.B. was objectively in custody for *Miranda* purposes (see *People v. Davidson, supra,* 221 Cal.App.4th at pp. 971–972 [custody determination is an objective test]), a question we need not decide, Officer Kaiser may have believed, in light of the above factors, that M.B. was not in custody.

For the foregoing reasons, substantial evidence supports the conclusion Officer Kaiser did not engage in a two-step interrogation strategy calculated to deprive M.B. of her *Miranda* rights. Accordingly, the general rule in *Elstad*, rather than the exception in *Seibert*, applies here, and any *Miranda* violation in connection with M.B.'s unwarned statement on the street provides no basis for suppressing her subsequent, warned confession at the police station. In light of the proper admission of M.B.'s stationhouse confession, the admission of M.B.'s initial statement on the street, even if erroneous, could not have been prejudicial.

### 4.     Voluntariness

M.B. contends (1) her statement on the street was not voluntary, and her confession at the station should have been suppressed as the fruit of the first confession, and (2) she did not knowingly and voluntarily waive her *Miranda* rights at the station.

" '[C]ourts apply a "totality of circumstances" test to determine the voluntariness of a confession.  [Citations.]  Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " . . . In determining whether a confession was voluntary, "[t]he question is whether defendant's choice to confess was not 'essentially free' because his will was overborne." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 411 (*Boyette*).)  As to M.B.'s waiver of her *Miranda* rights at the station, we similarly inquire " 'into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo [her] rights to remain silent and to have the assistance of counsel.'  Because defendant is a minor, the required inquiry 'includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether [she] has the capacity to understand the warnings given [her], the nature of [her] Fifth Amendment rights, and the consequences of waiving those rights.' " (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*).)

On appeal, we accept the trial court's factual findings if supported by substantial evidence, but we independently determine whether the challenged statements were voluntary or were obtained in violation of *Miranda*.  (*Boyette, supra,* 29 Cal.4th at p. 411; *Lessie, supra,* 47 Cal.4th at p. 1169.)  The prosecution bears the burden of proving, by a preponderance of the evidence, the voluntariness of a confession (*Boyette*, *supra*, 29 Cal.4th at p. 411) and the validity of a challenged *Miranda* waiver (*Lessie, supra,* 47 Cal.4th at p. 1169).

After considering the totality of the circumstances, we conclude M.B.'s initial statement to Officer Kaiser on the street was voluntary, and therefore her later statement

at the station did not have to be suppressed as the fruit of the first statement.  Although M.B. was only 13 years old, the questioning apparently was brief and occurred outside in a public place.  As noted, police had not handcuffed M.B., placed her in a police car, or arrested her.  The officers did not use force or threats of force.  In this context, Officer Kaiser's deceptive statement that H.F. had implicated M.B. did not render M.B.'s admission involuntary.  (See *People v. Chutan, supra,* 72 Cal.App.4th at p. 1280 [police subterfuge that is not coercive does not render confession involuntary].)

Contrary to M.B.'s argument, Officer Kaiser's statement that it would look bad if M.B. lied was not a threat or an implied promise of leniency rendering M.B.'s admission involuntary.  (See *People v. Brommel* (1961) 56 Cal.2d 629, 633–634 [police threatened to "brand[]" defendant as a "liar" in a report to judge, which would foreclose possibility of leniency], overruled on another point in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510 & fn. 17.)  Instead, we construe this single statement by the officer as an explanation to M.B. that it would be beneficial for her to tell the truth.  " '[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115; *People v. Carrington* (2009) 47 Cal.4th 145, 174.)  We conclude Officer Kaiser's statement to M.B. on this point, considered in combination with the officer's other statements to M.B. and all the surrounding circumstances, including M.B.'s age, did not render M.B.'s statement on the street involuntary.  We therefore reject M.B.'s argument that her later statement at the station was inadmissible as the fruit of the allegedly involuntary statement on the street.

We also conclude M.B. knowingly and voluntarily waived her *Miranda* rights at the station.  The video recording of the interview, which shows M.B. and the officer speaking calmly to each other, does not reveal any coercive or threatening conduct by the officer and contains no indication that M.B. was distressed.  The video recording also shows Officer Kaiser informed M.B. of her rights to remain silent and to have the assistance of counsel, and M.B. acknowledged that she understood those rights.  Contrary to M.B.'s suggestion that these warnings were insufficient, the officer was not required to

12

inform M.B. that her prior statement might be inadmissible, that H.F. had not implicated her, or that H.F.'s statement would not be admissible against her. (See *Elstad, supra,* 470 U.S. at pp. 316–317; *Moran v. Burbine* (1986) 475 U.S. 412, 422 [suspect is not entitled to "a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights"].) We agree with the juvenile court's conclusion that nothing on the video suggests M.B.'s will was overborne by police conduct.

**B.     Section 700.1 and DEJ**

**1.     Background**

The juvenile court set the contested jurisdictional hearing for November 22, 2013. M.B. filed a motion to suppress evidence and set the motion for hearing at the same time the court had set the jurisdictional hearing. On November 20, 2013, the court signed an order shortening time for hearing the motion to suppress; the motion was filed on November 21. M.B.'s trial counsel stated that, in preparation for the jurisdictional hearing, he had discovered information supporting a motion to suppress.

At the beginning of the November 22 hearing, the court stated it would permit the People to call Dias to testify first (as to jurisdiction) and then to call the police witnesses to testify on the suppression issues. M.B.'s counsel, citing *In re Mitchell G.* (1990) 226 Cal.App.3d 66 (*Mitchell G.*), stated he objected to that procedure, because section 700.1 requires a juvenile court to hear a motion to suppress before jeopardy attaches, which occurs when the first witness is sworn to testify as to jurisdiction. When counsel for the People stated he did not object to the court's combined hearing procedure, the court ordered Dias sworn to testify.

After the parties presented testimony and other evidence on the suppression and jurisdictional issues, the court heard closing arguments on both issues. The court then ruled on both matters, denying the motion to suppress and sustaining the petition.

**2.     Violation of Section 700.1**

Section 700.1 provides in part: "Any motion to suppress as evidence any tangible or intangible thing obtained as a result of an unlawful search or seizure shall be heard

13

*prior to the attachment of jeopardy . . . .*[9] (Italics added.) Jeopardy attaches in a criminal juvenile proceeding " 'when the first witness is sworn at the adjudicatory phase of the jurisdictional hearing' "; after that point, a juvenile may not be retried unless there is a mistrial. (*In re Pedro C.* (1989) 215 Cal.App.3d 174, 180.)

Here, the juvenile court's combined hearing procedure violated section 700.1. The court did not hear M.B.'s motion to suppress *prior* to Dias's being sworn for the adjudicatory phase of M.B.'s case. The juvenile court's understandable desire to streamline the proceedings (and to permit Dias, who was elderly and suffered from diabetes, to complete her testimony first so she would not have to wait for other witnesses to testify) did not eliminate the express requirement of section 700.1. In light of M.B.'s objection to a combined hearing, the court had to hear the motion to suppress prior to the swearing of the first witness at the adjudicatory phase.

The Attorney General contends the purpose of section 700.1 is to avoid a double jeopardy problem in the event a motion to suppress is granted,[10] and, because the court denied M.B.'s motion to suppress, this double jeopardy problem did not arise. But this argument does not establish the court's procedure was permissible under section 700.1. As we have explained, the court's combined hearing procedure violated the statute. (See *Mitchell G., supra,* 226 Cal.App.3d at p. 71 [by combining suppression and jurisdictional

---

[9] Section 700.1 states: "Any motion to suppress as evidence any tangible or intangible thing obtained as a result of an unlawful search or seizure shall be heard prior to the attachment of jeopardy and shall be heard at least five judicial days after receipt of notice by the people unless the people are willing to waive a portion of this time. [¶] If the court grants a motion to suppress prior to the attachment of jeopardy over the objection of the people, the court shall enter a judgment of dismissal as to all counts of the petition except those counts on which the prosecuting attorney elects to proceed pursuant to Section 701. [¶] If, prior to the attachment of jeopardy, opportunity for this motion did not exist or the person alleged to come within the provisions of the juvenile court law was not aware of the grounds for the motion, that person shall have the right to make this motion during the course of the proceeding under Section 701."

[10] When a juvenile petition is dismissed after the granting of a motion to suppress, the People may not appeal if the result of the appeal would be a proceeding subjecting the juvenile to double jeopardy. (§ 800, subd. (b)(1); *Mitchell G., supra,* 226 Cal.App.3d at pp. 69, 71–72.)

hearings, juvenile court "chose to ignore the legislative direction codified in section 700.1"].) We next consider whether the court's error requires reversal of the suppression or jurisdictional rulings.

### 3.     The Motion to Suppress

We reject M.B.'s argument that the violation of section 700.1 requires reversal of the court's ruling on the motion to suppress.[11] On appeal, M.B. asserts the reason the juvenile court decided to combine the suppression and jurisdictional hearings was that the court wanted to hear all the evidence relating to guilt and then "adjust its ruling on the suppression motion to ensure that the minors, if factually guilty, were punished." The record provides no support for this claim. To the contrary, the record shows the juvenile court agreed to allow Dias to testify first because of her age and health condition, so she would not have to "wait[] around all day[.]"

Nor are we persuaded by M.B.'s argument that hearing Dias's testimony at the outset of the hearing was prejudicial because it improperly influenced the court's ruling on the motion to suppress. As M.B. notes, when the court announced its ruling on the suppression and jurisdictional issues, the court began by referring briefly to Dias's testimony and her age and frailty (stating, "I will, just for a moment, sidetrack"), and then shifted to discussing the "legal arguments on the motion to suppress evidence." After explaining its ruling on the motion to suppress, the court turned to jurisdiction, addressing the sufficiency of the evidence and announcing it would sustain the petition. The court's brief initial comments about Dias do not persuade us the court improperly evaluated the evidence or the legal issues raised in connection with the motion to suppress.

---

[11] In her opening appellate brief, M.B. includes an argument heading asserting the juvenile court's combined hearing procedure constituted "structural error," but she presents no argument supporting that assertion. In her reply brief, M.B. includes a short argument that the combined procedure was structural error, requiring automatic reversal of the suppression and jurisdictional rulings. We decline to consider this argument developed for the first time in M.B.'s reply brief. (See *People v. Tully* (2012) 54 Cal.4th 952, 1075.)

### 4.     The Jurisdictional Ruling

We agree with M.B. that the court's combined hearing procedure was prejudicial because it deprived M.B. of the opportunity to be evaluated for DEJ after the denial of her motion to suppress.  We conclude the jurisdictional and dispositional orders therefore must be vacated and the case remanded for the juvenile court to determine whether M.B. is suitable for DEJ.

"The DEJ statutes 'empower the court, under specified conditions, and upon the minor's admission of the allegations of the petition, to place the minor on probation without adjudging him or her to be a ward of the court.' " (*In re D.L.* (2012) 206 Cal.App.4th 1240, 1243.)  The district attorney determines whether a minor meets the threshold eligibility requirements for DEJ.  (See § 790, subd. (b); rule 5.800(b)(1); *In re Luis B.* (2006) 142 Cal.App.4th 1117, 1122.)  Here, in conjunction with the wardship petition, the district attorney filed a determination that M.B. is eligible for DEJ.

The juvenile court "has the ultimate discretion to rule on the suitability of the minor for DEJ after consideration of the factors specified in [rule 5.800(d)(3)] and section 791, subdivision (b), and based upon the ' "standard of whether the minor will derive benefit from 'education, treatment, and rehabilitation' rather than a more restrictive commitment." ' " (*In re Luis B., supra,* 142 Cal.App.4th at p. 1123.)  "The court may grant DEJ to the minor summarily under appropriate circumstances ([rule 5.800(d)]), and if not must conduct a hearing at which 'the court *shall* consider the declaration of the prosecuting attorney, any report and recommendations from the probation department, and any other relevant material provided by the child or other interested parties.' " (*In re Luis B., supra,* at p. 1123.)  Although the court retains discretion to deny DEJ to an eligible minor, it has a mandatory duty "to either summarily grant DEJ or examine the record, conduct a hearing, and make 'the final determination regarding education, treatment, and rehabilitation . . . .' " (*Ibid.*)  "The court is not required to ultimately grant DEJ, but is required to at least follow specified procedures and exercise discretion to reach a final determination once the mandatory threshold eligibility determination is made." (*Ibid.*)  "As to both summary and nonsummary grants of DEJ, where the minor

16

has received notice informing him of his eligibility for DEJ, at 'sometime prior to the court's grant of DEJ at the hearing on the minor's suitability for DEJ,' the minor must admit the petition's allegations in lieu of a jurisdictional hearing." (*In re D.L., supra,* 206 Cal.App.4th at p. 1244.)

The juvenile court is not required to hold a hearing to consider a minor's suitability for DEJ if the minor, after receiving notice of eligibility for DEJ, rejects DEJ consideration by contesting the charges. (*In re D.L., supra,* 206 Cal.App.4th at p. 1244; see *In re Kenneth J.* (2008) 158 Cal.App.4th 973, 979–980.) But a caveat to this principle is that a minor may pursue a motion to suppress and accept DEJ after the suppression motion is denied. (*In re Joshua S.* (2011) 192 Cal.App.4th 670, 680–681; *In re A.I.* (2009) 176 Cal.App.4th 1426, 1434 ["a minor may first litigate a suppression motion and then, after its denial, accept DEJ"].) Here, because the juvenile court held a combined hearing on the suppression and jurisdictional issues and announced its rulings on both issues at the same time, M.B. had no opportunity, after denial of her motion to suppress, to seek to be considered for DEJ.

The Attorney General suggests that, during the combined suppression/jurisdiction hearing, M.B. could have protected her right to be evaluated for DEJ by advising the juvenile court she wanted a DEJ suitability evaluation after the ruling on the motion to suppress, but before the court decided whether to sustain the petition. But, once the jurisdictional hearing commenced, M.B. was not entitled to a DEJ suitability hearing, because she had not admitted the allegations of the petition " 'in lieu of jurisdictional and dispositional hearings.' " (See *In re T.J.* (2010) 185 Cal.App.4th 1504, 1509, 1512.)

Finally, the Attorney General argues we need not reverse because it is unlikely the juvenile court would have found M.B. suitable for DEJ. We disagree. "Where a minor is deprived of the opportunity for a hearing and deprived of fundamental procedural rights, reversal is compelled." (*In re D.L., supra,* 206 Cal.App.4th at p. 1245 [denial of DEJ suitability hearing].)

## III.  DISPOSITION

The jurisdictional and dispositional orders are vacated, and the matter is remanded to the juvenile court with directions to conduct further proceedings in compliance with section 790 et seq. and rule 5.800.  If the juvenile court grants DEJ to M.B., the jurisdictional and dispositional orders will remain vacated.  If the juvenile court denies DEJ to M.B., it shall reinstate its jurisdictional and dispositional orders, subject to M.B.'s right to have the denial of DEJ and the jurisdictional and dispositional orders reviewed on appeal.  (See *In re Luis B., supra,* 142 Cal.App.4th at pp. 1123–1124.)


_____
Bolanos, J.*


We concur:


_____
Ruvolo, P.J.

_____
Reardon, J.


* Judge of the San Francisco City and County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.